# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
July 13, 2000 Session

# IN THE MATTER OF THE ESTATE OF S.W. BRINDLEY, DECEASED

**Direct Appeal from the Circuit Court for Giles County**
**No. 9944   Stella L. Hargrove, Judge**

---

**No. M1999-02224-COA-R3-CV - Filed August 7, 2002**

---

This is a will contest between two siblings.  After the onset of the parties' father's final illness, during which his competence was questioned and eventually a conservator appointed, the father executed a codicil to his will that materially altered the distribution of his estate in favor of his son, the appellant herein.  The testator's daughter challenged the validity of the codicil in the underlying action.  After the jury found that the codicil was not the testator's "own free act," but was instead the result of undue influence on the son's part, the codicil was declared a nullity.  We affirm the jury's verdict.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

Thomas W. Hardin, Kim B. Kettering, Columbia, Tennessee, for the appellant, Robert Brindley, Sr.

Robert C. Henry, William Stuart Fleming, Columbia, Tennessee, for the appellee, Linda Brindley Dale.

## OPINION

This is a will contest between two siblings, Robert Brindley, Sr., and Linda Brindley Dale, over a codicil executed by their father, S.W. Brindley ("the testator"), at a time when his competence had been questioned and after a conservatorship proceeding had been initiated.  The codicil materially altered the distribution of his estate, as established in prior testamentary documents,  in favor of his son.  In the underlying action, the testator's daughter, Linda Dale, challenged the validity of the codicil.  Although the jury found that the testator had been of sound mind on the date he executed the disputed codicil, it also found that the codicil was not the testator's "own free act," but

was instead the result of undue influence by the son, Robert Brindley. The codicil was declared a nullity.

Mr. Brindley has appealed and argues: (1) the trial court should have granted his motion for directed verdict, made at the close of the proof, on the issue of undue influence; (2) the verdict is against the weight of the evidence on the issue of undue influence, and the trial court failed to exercise its duty as the thirteenth juror in approving the verdict; and (3) the jury was improperly instructed as to undue influence.

## I. Standard of Review

Our standard of review of a jury's factual findings in a civil action is limited to determining whether any material evidence supported the verdict. Tenn. R. App. P. 13(d). The appellate courts do not determine the credibility of witnesses or weigh evidence on appeal from a jury verdict. *Conatser v. Clarksville Coca Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995); *Benson v. Tennessee Valley Elec. Coop.*, 868 S.W.2d 630, 638-39 (Tenn. Ct. App. 1993). Where the record contains material evidence supporting the verdict, the judgment based on that verdict will not be disturbed on appeal. *Reynolds v. Ozark Motor Lines, Inc.*, 887 S.W.2d 822, 823 (Tenn. 1994).

In reviewing the denial of a motion for directed verdict, this court must take the strongest legitimate view of the evidence in the light most favorable to the non-movant, and all evidence contrary to that view must be discarded. *State Farm Gen. Ins. Co. v. Wood*, 1 S.W.3d 658, 662 (Tenn. Ct. App. 1999). A directed verdict is not appropriate when there are material disputed facts or when there is disagreement regarding the conclusions that could be drawn from the evidence presented. *Mitchell v. Smith*, 779 S.W.2d 384, 387 (Tenn. Ct. App. 1989). Viewing the evidence in accordance with those principles:

> A directed verdict is appropriate only when the evidence is susceptible to but one conclusion. . . . As this Court has stated, "The court may grant the motion only if, after assessing the evidence according to the foregoing standards, it determines that reasonable minds could not differ as to the conclusions to be drawn from the evidence."

*Alexander v. Armentrout*, 24 S.W.3d 267, 271 (Tenn. 2000) (citations omitted).

In *Alexander*, our Supreme Court discussed the interplay between the standard of review for directed verdict and the material evidence rule. In that case, the Court determined that the court of appeals had correctly stated the applicable standard of review for a motion for directed verdict, as set out above, but had misapplied the standard when evaluating the evidence. *Alexander*, 24 S.W.2d at 271. The error on the part of the intermediate court was engaging in a *de novo* review of the evidence "in that it appears to have disregarded the jury's findings and to have reevaluated the evidence in its entirety." *Id.*; *see also Williams v. Brown*, 860 S.W.2d 854, 857 (Tenn. 1993) (holding that on review of the grant of a directed verdict, it is not the office of an appellate court to

weigh the evidence). In *Alexander*, the Supreme Court then proceeded to examine the sufficiency of the evidence in the record to support the jury's specific factual findings, reflected in a special verdict form, and found, under the "no material evidence rule," that there was evidence to support those findings. *Alexander*, 24 S.W.2d at 271-72. Those findings of fact determined the legal issues involved, and the Court affirmed the trial court's denial of directed verdict. *Id.* at 274.

In accord with this guidance, our first task is to determine whether there is material evidence in the record to support the jury's findings. If there is material evidence to support the jury's findings, then, of necessity, granting a directed verdict for the losing party would have been improper because the evidence permitted reasonable minds to reach a conclusion different from that asserted by the losing party. The special verdict form in the record before us indicates that when asked "Was the execution of the Final Codicil by S.W. Brindley his own free act and will and not the result of undue influence of Mr. Brindley?" the jury answered "No." Robert Brindley's argument herein is that the evidence is not sufficient to establish the requisite legal elements of "undue influence." We begin with the evidence presented at trial.

## II. The Evidence

Although he had little formal schooling, the testator successfully built up a number of businesses. According to his initial will, which he jointly and separately executed with his wife, Edna Brindley, in February of 1976, the testator owned a lumber yard, a service station, a sheet metal shop, a coal yard, a farm, and twelve pieces of rental property. He also owned a trucking company and a construction business, which he transferred to his son, Robert Brindley, Sr., long before the events in question.

The initial will provided that all real and personal property of the testator, S.W. Brindley, and his wife, Edna Brindley, would pass to the survivor. At the survivor's death, the lumber yard and the real property on which the service station, sheet metal shop, and coal yard were located were bequeathed to Linda Dale. The farm was left to Robert Brindley, Sr.,[1] and the siblings were to share equally in the twelve pieces of rental property and a home located on Madison Street in Pulaski, Tennessee. The will provided that any future property the testators acquired was to be shared equally between the siblings, including all stocks, bonds, and bank accounts. Linda Dale was appointed to serve as executrix without bond, and in the event of her death, the President of Union Bank was designated to serve in her place.

Linda Dale began working at her father's lumber yard in the late 1950's while in high school, and worked there continuously since that time. Her husband, Terry Dale, began working there in 1961. In late 1979, Linda Dale, her parents and her husband executed a partnership agreement

---

[1] Several years after this will was executed in September of 1984, Robert Brindley purchased this farm from his father, and resold it at a profit two months later.

relating to the lumber yard, transferring 49% of the business to the Dales. Linda Dale testified that her father had assured her that she and her husband would eventually own the lumber yard.

Robert Brindley also worked at the lumber yard for a few years after he left high school. He then started a construction company, which he still operated at the time of trial herein. Initially, he purchased the business from his father. Robert Brindley described this transaction as simply the purchase of some tools, and the license went with the purchase.

In June of 1980, S.W. Brindley and Edna Brindley executed a codicil to their will. The codicil reiterated that they wished Linda Dale to be their executrix. However, it stipulated that if she predeceased her parents, her brother, Robert Brindley, was to serve as executor.

Several years later, the testator began experiencing heart problems. In July 1983, he suffered several heart attacks and underwent open heart surgery. He enjoyed a full recovery from the surgery and was able to continue his businesses, care for himself, and drive.

In February of 1984, the testator and his wife executed a power of attorney to Linda Dale. At some unspecified time in 1984, the testator's wife, Mrs. Brindley, broke her hip. During surgery on her hip, she suffered a stroke which left her unable to speak. After her hospitalization and a brief period in a nursing home, the testator brought her home, where she received round-the-clock care.

After his wife suffered the stroke, the testator executed a second codicil to the will.[2] This codicil, dated February 13, 1985, reaffirmed the testator's intent to bequeath all his interest in the lumber yard to Linda Dale and specifically defined the scope of the interests in the business he intended to convey. It stated:

> Whereas, by Item IV of my Last Will and Testament dated the 20th day of February, 1976, in the first sentence thereof, I devised and bequeathed to my daughter, Linda Brindley Dale, the lumber yard property. It was then and is now my intent and I do hereby devise and bequeath to my daughter, Linda Brindley Dale, the entire lumber yard property which shall include not only the real estate and all appurtenances and fixtures affixed thereto but it shall also include my interest in the business known then as S.W. Brindley and Son Coal and Lumber Company and now known as S.W. Brindley and Dale Coal and Lumber Company and all assets associated therewith.

On March 30, 1987, the testator executed a third codicil to his will. This codicil made a specific devise of a piece of real property and residence to John Coleman, one of the testator's employees. It also stated, "In all other respects, I hereby reaffirm my Last Will and Testament dated February 10, 1976."

---

[2]Although this document is titled "Codicil No. 1," it is actually the second codicil to the February 10, 1976, will.

In September of 1988, the testator's heart problems worsened and his doctors advised him to have a second surgery, which he underwent on September 28, 1988. It was after this second surgery that a number of circumstances changed.

According to Linda Dale, the testator was "very confused" after the surgery. While in the critical care unit after the surgery, he became convinced that he was going home and would roll up the mattress cover and refuse to stay in bed. Once he was moved into a room, he appeared to believe that he was riding on a train through Alabama and Missouri. He also attempted to run away and was discovered barefoot in his pajamas walking out the front door of the hospital. Linda Dale hired private sitters to stay with her father until his discharge. After two weeks in the hospital, Linda Dale brought her father home. She found him very confused and at times violent, although she had not known him to be violent in the past.

After consulting testator's cardiologist, Linda Dale then took her father to a psychiatrist, Dr. Treadway. Dr. Treadway admitted the testator to the mental ward at St. Thomas Hospital in Nashville on December 29, 1988. The testator was discharged on January 19, 1989, and returned home. However, according to Linda Dale he was actually worse.

He would slap at you, and he would run out the door, and he would -- he kept saying, you know, he wasn't at home. He'd like to go to his [home]. . . He demanded Ms. Kelly, Clara Kelly, who was sitting with Mother at the time, and he told her, you know, he didn't know who she was and ordered her to leave. And he kept telling Mother to get up and fix his dinner. And, of course, Mother was an invalid by then and wasn't even able to sit up, and he didn't realize that. And he spoke about things we didn't understand . . . he thought that Mother was on a hill, and he was going to hire a helicopter to come and get him and Mother and take them home. And he talked about his pistols, and he talked about using that pistol on himself. And he wanted to know if he put the pistol in one ear and he pulled the trigger, would it kill him or would it just come out the other side.

Linda Dale had her father readmitted to St. Thomas Hospital on January 21, 1989, where he remained until February 13, 1989. During this admission, Linda Dale arranged for her mother to be placed in a nursing home. After her father's discharge from St. Thomas, he was placed in the nursing home as well, in the room next to his wife. Linda Dale continued to employ sitters to remain with her mother around the clock. Linda Dale testified that her father got to the point where somebody had to stay in the room with him or he required restraint to prevent him injuring himself.

A. The Conservatorship

On October 25, 1989, Linda Dale petitioned for appointment of a conservator for her father. In that petition, she alleged that her father, the testator herein, was and had been for almost one year incapable of managing his estate. She attached letters from her father's physicians, Dr. Haney and Dr. Grossman, both dated December 1988, stating that the testator was incompetent to manage his

affairs. The December 9, 1988, letter from the testator's cardiologist, Laurence Grossman, M.D., stated:

> Mr. Brindley has been quite ill in the past. He has coronary heart disease, advanced. He is diabetic and has cerebrovascular disease. He has many periods of confusion and disorientation. Mr. Brindley is incapable at this time of managing his own affairs, both financial and otherwise.

The December 12, 1988, letter by C.D. Haney, M.D., the testator's longtime physician, stated:

> Mr. Brindley is an 80-year-old, white male that has had some very serious medical problems including diabetes mellitis, severe coronary artery disease and atherosclerotic cerebral vascular disease. He has recently become confused at times, forgetful, disoriented and his judgment has been impaired to the point that he is unable to handle his own affairs in a reasonable manner. It is my opinion that the courts should appoint someone to watch after Mr. Brindley's affairs, both financial and otherwise.

Also attached to the petition were affidavits from Dr. Grossman and Dr. Treadway, the psychiatrists who had treated the testator, in the form of certificates of examination, dated October 1989, that attested that the testator was currently unable to manage his affairs "by reason of suffering from a physical incapacity or mental weakness."

The petition also alleged that Linda Dale had learned that "on September 26, 1989, S.W. Brindley, during his incompetency, revoked a valid general power of attorney granted to the Petitioner [Linda Dale]" and that the testator had signed a power of attorney making his son, Robert Brindley, his attorney in fact. The petition further alleged that:

> Robert Brindley has attempted to use the invalid power of attorney to gain access to the business records of S.W. Brindley and Dale, a partnership which is owned 51% by S.W. Brindley and wife, Edna Brindley and 49% by Linda Brindley Dale and husband Terry Dale. Robert Brindley knows or should know that his power of attorney is invalid and has maliciously used said invalid power of attorney to interfere with the partnership business of the Petitioner and S.W. Brindley. The partnership will suffer irreparable harm unless Robert Brindley is restrained from using the invalid power of attorney.

A guardian ad litem was appointed who answered the petition by denying that the testator was incompetent and denying the need for the appointment of a conservator. In the answer, the guardian ad litem responded to the above-quoted allegation by admitting that the testator had revoked the previously existing power of attorney which made Linda Dale his attorney in fact and, about the same time, executed a power of attorney "for his son, Robert Brindley." The guardian ad

-6-

litem further admitted "Robert Brindley, at the request of Mr. S.W. Brindley, and acting through the Power of Attorney, requested an audit of business records of Brindley and Dale . . . ."

Robert Brindley opposed the conservatorship and later testified that he spent around $40,000 to $50,000 in attorney's fees contesting the petition, "fighting" to keep his father from being declared incompetent. He testified that his father did not want to be declared incompetent and that he, Robert, did not believe that his father was incompetent to handle his affairs at that time. As part of the efforts to oppose the conservatorship, Robert Brindley, Sr., took his father to another doctor, Dr. Wells, a neurologist-psychiatrist, for an examination.

Dr. Wells examined the testator on November 27, 1989. He talked for over an hour with the testator and briefly with Mr. Brindley before examining the testator. Dr. Wells concluded that there was no evidence of serious impairment of the testator's memory or other cognitive functions. The doctor felt there was no reason why the testator was not competent to manage his own life and his business affairs.

Thereafter, a motion to dismiss the petition for conservatorship was also filed by testator, "individually and through his power of attorney, Robert Brindley."[3] The motion asserted that no conservator was necessary because the testator was capable of managing his affairs. The motion also stated that testator had on November 27, 1989, visited Dr. Wells for an examination of his cognitive functions and mental capacity. The results of that examination were set forth in a filed deposition. The motion also asserted that Robert Brindley talked with testator on a daily basis and found him capable of managing his own affairs.

Subsequently, the parties agreed to an independent psychological examination, and the court entered an agreed order appointing Dr. Pamela Auble to conduct "an independent geriatric physiological test" and make her findings available to counsel. That examination was ordered to be held April 11, 1990, and was so held. The date is significant because of its proximity to the execution of the codicil at issue herein. At trial, Dr. Auble testified that in her opinion, the testator was not able to manage his affairs on April 11, 1990. She also testified that a person who suffered from his problems would be easily manipulated.

The testing revealed "mild intellectual impairment with more moderate compromise in new learning and mental flexibility." His verbal IQ fell near the bottom of borderline retarded for his age. For example, despite what the doctor characterized as a "good effort," the testator could not remember two sentences after five minutes. He could not recall the year of his birth or the name of the vice president. Nor could he remember the ages of his children or the number or sex of his grandchildren. Dr. Auble stated that she predicted that his intelligence previously had been in the high average to superior range.

---

[3]When questioned about the motion to dismiss, Robert Brindley testified, "My dad wasn't in that petition." He also stated the motion was filed by an attorney "that I hired to file on his [the testator's] behalf."

The conservatorship proceeding was finally resolved by entry of an order on February 8, 1991, reflecting that all parties agreed that the testator was, at that time, in need of a conservator to manage his affairs and that he was incompetent to do so himself.[4] The court appointed Philip K. Baddour, a certified public accountant, as the conservator. The conservator continued to draw 51% of the profits from the lumber yard for the testator's benefit. The conservator filed an annual accounting with the court until the testator's death in 1998.

The final agreed order in the conservatorship proceeding also stated:

The Restraining Order heretofore issued on October 26, 1989, in this cause against Robert Brindley be and the same is hereby dissolved, the restrictions imposed in said Order against all parties named therein are lifted, and the obligations of Linda Dale and Terry Dale as principal and surety on the bond are discharged in full.

The record before us does not include a copy of the referenced restraining order, but the original petition requested that a restraining order be issued against Robert Brindley "prohibiting him from using the power of attorney given to him by S.W. Brindley in any manner and specifically from gaining access to the financial records of S.W. Brindley, individually or as partner of S.W. Brindley and Dale until a hearing in this cause."

At trial, Robert Brindley explained that he eventually agreed to the conservatorship because he concluded that if the parties selected the right conservator his father's affairs would be managed well, that his father had sufficient resources to take care of his needs, and because Robert was at that point unable to continue to spend money fighting the conservatorship. "I went back to Dad and told him that nothing was going to change, we weren't going to be putting him out, wasn't going to put him away or anything to that extent."

B. October 1989 through April 1990

While the testator was living in the nursing home, Mr. Wayne Baker was hired in 1989 to sit with him. Mr. Baker's wife previously cared for the testator's wife for some time. Although the parties apparently dispute who actually hired Mr. Baker, Mr. Baker testified that it was Robert Brindley who asked him to care for his father. Mr. Baker described the testator's condition when he first started sitting with him. He stated that the testator's condition deteriorated during the first three or four months to the point where he was unable to feed himself, shower himself, get in bed by himself, or get around by himself.

---

[4]Dr. Wells examined the testator again in December 1990 and determined that it was appropriate for a conservator to be appointed for him at that time.

Mr. Baker further testified that the testator's condition improved after his medications were gradually adjusted and eventually he wanted to go home. According to Mr. Baker, the testator believed that Linda Dale would not allow that. Mr. Baker helped the testator contact his attorney, Howell Forrester, who assisted the testator in changing his power of attorney to Robert Brindley. Sometime after this change, Mr. Baker and the testator attempted to leave the nursing home, but Linda Dale and her daughter(s) talked the testator into staying. Mr. Baker also stated that the testator stayed in part because he "really didn't want to leave" his wife, who was still in the nursing home.

On January 31, 1990, while the petition for appointment of a conservator was pending, the testator checked himself out of the nursing home. He moved back to his home with Mr. Baker. When the testator returned home, Mr. Baker lived with him full-time. According to Linda Dale, at that point:

> Daddy was able to feed himself. He wasn't able to dress himself, bathe himself. He had to have help. He was confused most of the time, you know, that he was going to be late for work or he was going to be laid off or be left, or he was afraid that he wasn't at home. He wanted to be sure and go home. And he thought that he wasn't at his home, of course, and he wanted to pack a lot, and put all his belongings together because whoever owned the home was going to make him move. He was just confused. . . . He visited Mother four or five times a day, I guess. Basically, we would take him over there, but like I say, he wouldn't stay but a minute. . . he would never sit down. He would give Mother something to drink. Most of the time he brought her bananas, and she got tired of bananas. . . . He wouldn't sit down. He would just say a word or two, and then he'd leave.

The record shows that for a time the testator was fairly active after he returned home. Mr. Baker testified that the testator visited his wife at least twice a day, ate most of his meals in local restaurants, began attending Lion's Club meetings and church. According to Mr. Baker, by 1990, the testator was able to bathe, dress, and shave himself.

Linda Dale's daughter, Brenda Davis, testified that she visited her grandfather daily from February to August of 1990. She recalled that:

> He was disoriented, confused. He didn't know relative facts about current events. He was just -- he was like a child, in a way. I guess that would be the best way for me to tell you how he was. He was not the grandfather that had raised me, in his mental capacity, but he was still my grandfather that I loved.

Linda Dale also visited her father almost every day in the months after the testator left the nursing home, although she realized that her father was upset with her because she had wanted to keep him in the nursing home.

Linda Dale testified that Mr. Baker took the testator to visit Robert Brindley, "but Robert didn't come by very often to see [his father]." Both Mr. Baker and Robert Brindley also testified that Mr. Baker would often take the testator to see Robert at his office. According to Mr. Baker, the testator often stated he wanted to talk to Robert about some particular matter.

According to Robert Brindley, the person who really took care of the day-to-day needs of his mother and father was Linda Dale, who saw them every day, made sure their needs were met, etc. Mr. Brindley testified that he went to see his father "a whole lot" while he was in the nursing home. However, he admitted that initially he didn't realize his father had been put in the nursing home because he had been out of town. He also testified that from 1985 to 1992, "I would see him, I would imagine, once a month would be about it, or maybe twice a month for a period of time. In the latter years [until the testator's death in 1998] I saw him less frequently." Although Robert Brindley testified he visited his father once or twice a month during the relevant time period, he also acknowledged that his father would frequently drop by his office.

Robert Brindley accompanied his father to the court-ordered examination by Dr. Auble on April 11, 1990. According to Mr. Brindley, his father was "extremely angry, extremely upset" about the prospect of the examination. Dr. Auble's tests showed, in addition to the results discussed above, that the testator was moderately depressed. According to the doctor's report, the testator reported that he was afraid of his children not getting along after his death and stated that he would be happier if "I could leave my will for my children evenly."

Dr. Auble's report stated that:

with his poor memory, Mr. Brindley would have great difficulty managing day to day business transactions. He does appear to have a good general grasp of his situation, but I do not think that he can be counted on for accurate recall of details. So far, the course of his disease does not resemble Alzheimer's in that he has apparently improved over the past year or so. It is possible that this was due to over-medication or something of that nature last year, and that now there will start to be a decline in functioning. Another possibility which could cause this pattern of deficits might be multi-infarct dementia.

The report also stated:

According to Mr. Brindley's son [Robert], his sister and her husband have taken money from his father's accounts at the lumber business which S.W. Brindley owns jointly with his daughter. He said that was why Linda Dale wants Mr. Brindley declared incompetent. S.W. Brindley [the testator] told me that one man had been sold $370,000 worth on credit though he had not paid his bills in the past, and that money had been taken out of his savings without his knowledge and put into the lumber business. He said that money from his savings had been used for the lumber business before, but that he had known about it in advance. Linda Dale reported that

-10-

the lumber business does owe her father money, but that it was historically common to do this in that business and that the debts were recorded in the books. She said that she had not stolen money from her father.

Both Linda Dale and her daughter, Brenda, testified that the testator never read anything after his second surgery. The record shows that the testator's sight had deteriorated, although he had been an avid reader before his illness. Mrs. Dale also testified that her father was unable to conduct any business after the 1988 surgery and hospitalization.

## C. The Final Codicil

According to Mr. Baker, in April of 1990, which would have been around the time of Dr. Auble's examination, the testator wanted to go to the office of his lawyer, Mr. Forrester. The testator told Mr. Baker he was going to have his will changed. Although Mr. Baker was present during the meeting between the testator and his attorney, he could not recall any specific parts of the discussion. According to Mr. Baker, after the testator told Mr. Forrester how he wanted the will written, Mr. Baker and the testator left.

A few days later they returned to the attorney's office to pick up the will. Mr. Forrester went over the will with the testator. Although Mr. Baker did not know the specifics of the conversation, he testified that the testator did not express any dissatisfaction with the will at that point. They left with a copy of the will, and the testator wanted to go to Robert Brindley's office.

Mr. Baker and the testator went straight to Robert Brindley's office from the lawyer's office. Mr. Baker testified, "Well, when we walked in and everything, you know, he told Robert that he wanted him to read the will." The testator handed the document to Robert Brindley, who read the will out loud to the testator. The testator then said, "No. That's not how I want it."

According to Mr. Baker, he and the testator then returned immediately to the attorney's office, where the testator told the attorney how he wanted the will written. Mr. Forrester replied that he would change the will and the testator could pick it up later. Several days later Mr. Baker took the testator to the attorney's office, Mr. Forrester read the will to the testator, and they executed it. Mr. Baker did not remember if they then took a copy of the will to Robert Brindley.

Mr. Forrester, the attorney, recalled that he went, at the testator's request, to the nursing home for the first discussion about changing the will. Mr. Forrester was unable to recall any specific events surrounding the execution, but was certain that the same procedure was followed as with all other wills he drafted. He identified his signature and that of his secretary as witnesses. He testified that the testator understood the codicil and understood that it would be effective only if his wife predeceased him, a condition which is reflected on the document itself.

Mr. Forrester did not mention the other visits to his office, as described by Mr. Baker, or the revision after the first draft. He did not testify that he gave any advice to the testator. He stated that

the kept the codicil in his safe until the testator's death and told Robert Brindley about it at the testator's funeral. He testified that Robert said he would tell his sister about it.

The testator executed the codicil[5] at issue on April 19, 1990. The parties do not dispute that it was duly executed. In addition to making Linda Dale and Robert Brindley co-executors, the document stated in pertinent part:

> I direct that my two (2) children, two-wit: Robert Brindley, Sr. and Linda Brindley Dale, share equally in any and all of my property. This includes bank accounts, my interest in the Brindley and Dale Lumber Company, my vehicles and all of my property including residential and rental property that I might own, except as shown in the last paragraph of this item.

> I direct that all the property that I might own will go to them equally and they can have a public auction, sell this privately or divide it among themselves. If they can not agree then of course, the executor will have the ultimate authority to sell and dispose of the property and divide the proceeds.

> Heretofore, I gave Linda Brindley Dale 49% of Brindley and Dale Lumber Company. I want Robert Brindley, Sr. to have 50% of the business. I therefore give Robert Brindley, Sr. 50% and give Linda Brindley Dale 1%.

> I want them to share the lumber company equally and each of my children will have a 50% interest in Brindley and Dale Lumber Company.

Robert Brindley later testified, "I had nothing to do with that will." He claimed no recollection of the incident described by Mr. Baker when the testator brought him the proposed codicil. He was unsure whether he received a copy of the final codicil prior to his father's death.

### D. Events After Execution of the Codicil

After reviewing her diary, Brenda Davis, recalled visiting her grandfather on April 19, 1990. According to Ms. Davis, her grandfather usually followed a predictable routine:

> Usually, it was, get up, Mr. Baker, he would have to get him ready and everything, and he would feed him, and then he loved to ride in the pickup when he was able. So Mr. Baker would ride him around, and he would bring him down to the office to visit my mother, and he would visit us sometimes, like that, and then he would go riding around again, and they would go eat, then usually they went back home, you

---

[5]Although the document at issue is entitled codicil, it revokes all prior wills and codicils. We will continue to refer to it as a codicil.

know, in the afternoon. So he would get out a whole, whole lot, but he would be in and out like that. And he was, you know, just riding, usually.

On April 19, however, the testator was not home in the afternoon and Ms. Davis went looking for him at the nursing home. According to Ms. Davis, when she finally caught up with him at home, she asked him what he had been doing and he said he didn't remember and denied going anywhere that afternoon. He appeared agitated. The April 19 entry in Ms. Davis's diary stated:

> I went by the house to see Pawpaw, and Mr. Baker and him were gone. And I went to the nursing home, and the sitter said that he had been by, but that Robert and Mr. Baker had taken him somewhere.

> I found out that they had went to see Mr. Forrester, but when I asked Pawpaw, he didn't even remember going to see Mawmaw or anything. He was confused, so I dropped it. Pawpaw said he had to go pick up Mawmaw by helicopter because they were on a hill, and it would take them to Pulaski which was 1,000 miles away.

Ms. Davis testified that at no time after April 19, did her grandfather appear "normal." Nor did she think that he could "fool" someone "into thinking he knew what he was talking about" because he was unable to carry on a conversation.

Mrs. Edna Brindley died in April of 1994. In that same year, Mr. Baker also stopped caring for the testator because the testator gradually started deteriorating, losing his memory, and sometimes needed to be restrained or quieted. After Mr. Baker stopped caring for the testator, he began working at Robert Brindley's construction company, where he worked for a couple of years. Mr. Baker testified that he took snapshots and videotaped construction sites. He testified that, "If I wasn't doing that, I was there in the office doing -- just running fans and doing general things there in the office. And I handled maintenance on the vehicles." In contrast, Robert Brindley testified:

> . . . when Daddy had deteriorated a great deal, I gave Mr. Baker a job to look after the tools and to check tools out in the morning. It was a part-time job and such. And, yes, Mr. Baker worked for me for a short period of time over a period of two or three years, I think, in checking out tools and such because I was always very grateful for the way he had took care of my father.

The testator died on July 30, 1998. Linda Dale did not see the April 1990 codicil until it was mailed to her after his death. She filed the underlying petition for letters testamentary in which she requested that the will and the first two[6] codicils be admitted into probate and that the court determine the validity of the final codicil. In September, Robert Brindley filed a petition for substitution of executor, requesting the court appoint himself as executor, on the ground that he did

---

[6]There were actually three codicils prior to the 1990 one at issue.

not contest the validity of the final codicil. The case was transferred to Circuit Court and tried to a jury.

At trial, both parties testified at length. Linda Dale also offered, *inter alia,* the testimony of the testator's psychiatrist at St. Thomas Hospital, Dr. Treadway, who testified that he spent approximately twenty-five hours examining and treating the testator. His findings indicated the testator had substantial memory impairment. The doctor testified that he was "absolutely certain" that the testator was suffering from dementia, "which means permanent impairment of the brain functions" with no cure "of any kind." He testified:

> I'm 100 % sure that he had dementia. Can I be sure that he had Alzheimer's disease? No. It's possible that there were strokes that didn't show up on the x-rays. But I'm 90% sure that he had Alzheimer's disease. That is as sure as you can be without an autopsy, which was not obtained in this case.

Dr. Auble testified that in her opinion, the testator was not able to manage his affairs on April 11, 1990. She also testified that a person who suffered from his problems would be easily manipulated. She stated:

> In Mr. Brindley's case especially, I think, because it was important for Mr. Brindley to appear that he had a grip on the situation. He wanted to look like he really knew what was going on and sometimes that makes people -- it's easier to manipulate them because you can say to them, 'As you remember,' and, you know, they really don't remember, but they'll say, 'Oh yeah. Yeah. I remember.' And so it would be. I can see how it would be easy to manipulate him because he really didn't have much day-to-day memory. He really was trying to pass a lot where he had a good visage, a good appearance, that he wanted to appear that he knew what was going on and didn't want to say, 'well, you know, in fact, I don't have any idea what you're talking about.' He would just try to get along. Just like when I asked him the ages of his children. I don't think he knew, but he didn't tell me he didn't know. He just created some ages that maybe sounded reasonable.

Dr. Auble agreed that, "If you didn't know Mr. Brindley, truly know him, and know the history of his life and his children and so on, . . . [he could] carry on a conversation that would fool you into thinking he did know what he was talking about" but only "if you didn't drill him. You know, like if you saw him in Kroger's."

Robert Brindley introduced the testimony of Stacy Garner, his father's dentist and friend. Dr. Garner testified that during a dental appointment in April 1990, the testator was competent. However, Dr. Garner could not remember what they discussed and did not observe the testator either reading or writing.

-14-

Mr. Brindley also offered the deposition testimony of Dr. Wells, who had examined the testator on November 27, 1989, as part of the testator's and Robert Brindley's efforts to fight the appointment of a conservator. At that time, Dr. Wells concluded that there was no evidence of serious impairment in his memory or other cognitive functions. Dr. Wells examined the testator again on April 26, 1990, just days after the final codicil was executed, and his opinion had not changed. Dr. Wells testified that Robert Brindley was directly involved in having him evaluate the testator. Dr. Wells admitted that after examining the testator in December 1990, he determined that it was appropriate for a conservator to be appointed for him.

### III. Undue Influence

Mr. Brindley argues that the trial court erred in denying his motion for directed verdict on the issue of undue influence. He maintains that Linda Dale failed to satisfy her burden of providing either direct or circumstantial evidence of undue influence which, he contends, consists of proving both the existence of a confidential relationship between him and the testator and additional suspicious circumstances that justify invalidating the will or codicil. He asserts there was no proof that he enjoyed a "confidential relationship," as that term is defined in the law of undue influence, with his father.

Undue influence "upon a testator consists in substituting the will of the person exercising it for that of the testator." 1 JACK W. ROBINSON, SR. & JEFF MOBLEY, PRITCHARD ON THE LAW OF WILLS AND THE ADMINISTRATION OF ESTATES § 124, at 203 (5th ed. 1994). The essential issue on a question of undue influence is whether "the will is the will of the testator or that of another." *Id.* at § 130, at 210. A valid will is the product of the free exercise of independent judgment by a person who has the mental capacity to make a testamentary disposition. *In re Estate of Elam*, 738 S.W.2d 169, 171 (Tenn. 1987). Thus, undue influence exists where the free agency of a testator is destroyed to the extent that the will, though nominally the testator's own, is in reality that of another. *Taliaferro v. Green*, 622 S.W.2d 829, 837 (Tenn. Ct. App. 1981), *overruled on other grounds by Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995).

As a general rule, it is presumed that undue influence does not enter into the making of a will, or other conveyance, and the burden of proving undue influence falls upon the person contesting the document. *Hammond v. Union Planters Nat'l Bank*, 189 Tenn. 93, 109, 222 S.W.2d 217, 383-84 (1949). Thus, proof of due execution shifts the burden of going forward to the contestants to prove that the testator was unduly influenced in making his or her will. *In re Estate of Elam*, 738 S.W.2d at 173; *Owen v. Stanley*, 739 S.W.2d 782, 787 (Tenn. Ct. App. 1987), *overruled on other grounds by Matlock*, 902 S.W.2d at 386 n.10.

Parties opposing a will may carry their burden of proving that the testator was unduly influenced by proving the existence of suspicious circumstances warranting a conclusion that the will was not the testator's free and independent act. *Mitchell v. Smith*, 779 S.W.2d 384, 388 (Tenn. Ct. App. 1989); *Taliaferro*, 622 S.W.2d at 835-36.

While undue influence can be proved either by direct or circumstantial evidence, *see In re Depriest's Estate*, 733 S.W.2d 74, 78 (Tenn. Ct. App. 1986) (direct evidence); *Patton v. Allison*, 26 Tenn. (7 Humph.) 320, 333 (1846) (circumstantial evidence), direct evidence is rarely available. *Hager v. Hager*, 17 Tenn. App. 143, 161, 66 S.W.2d 250, 260 (1933). Thus, in most cases, those attacking a conveyance or will on the grounds of undue influence must prove the existence of suspicious circumstances warranting the conclusion that the person allegedly influenced did not act freely and independently.

*Fell v. Rambo*, 36 S.W.3d 837, 847 (Tenn. Ct. App. 2000) (citations omitted). Without direct evidence of undue influence, persons contesting a will must prove the existence of more than one suspicious circumstance in order to succeed. *Halle v. Summerfield*, 199 Tenn. 444, 455, 287 S.W.2d 57, 61 (1956).

Whether the circumstances relied upon by the party contesting the will are sufficient to invalidate the will should be decided "by application of sound principles and good sense to the facts of each case." *Halle*, 199 Tenn. at 454, 287 S.W.2d at 61. The range of facts which may be relevant to the question of whether suspicious circumstances exist is very broad.

It is generally held that upon such issues every fact and circumstance, no matter how little its probative value, which throws light upon these issues, is admissible. The range of inquiry may cover, not only the provisions of the will itself, and the circumstances surrounding its execution, but also the mental condition of the testator, the motive and opportunity of others to influence him unduly, his relations with persons benefitted by or excluded from the will, and the acts and declarations of such persons. Although none of these matters standing alone may be sufficient to establish the issues, yet taken together they may have that effect.

*Mitchell*, 779 S.W.2d at 388 (quoting *Hager v. Hager*, 17 Tenn. App. 143, 161, 66 S.W.2d 250, 260 (1933)). Thus, whether suspicious circumstances exist is a highly fact-specific question.

The suspicious circumstances often relied upon to establish undue influence are: (1) the existence of a confidential relationship between the testator and the beneficiary; (2) the testator's physical or mental deterioration; and (3) the beneficiary's active involvement in procuring the will. *In re Estate of Elam*, 738 S.W.2d at 173; *Kelly v. Allen*, 558 S.W.2d 845, 848 (Tenn. 1977); *Mitchell*, 779 S.W.2d at 388, *Taliaferro*, 622 S.W.2d at 835-36. Our courts have recognized other suspicious circumstances giving rise to undue influence. These include: (1) secrecy concerning the will's existence; (2) the testator's advanced age; (3) the lack of independent advice in preparing the will; (4) the testator's illiteracy or blindness; (5) the unjust or unnatural nature of the will's terms; (6) the testator being in an emotionally distraught state; (7) discrepancies between the will and the testator's expressed intentions; and (8) fraud or duress directed toward the testator. *Halle*, 199 Tenn. at 454-57, 287 S.W.2d at 61-62; *Mitchell*, 779 S.W.2d at 671. Although more than one circumstance must be present, "[t]he courts have refrained from prescribing the type or number of suspicious

-16-

circumstances that will warrant invalidating a will on the grounds of undue influence." *Mitchell*, 779 S.W.2d at 388.

## A. Confidential Relationships and Suspicious Circumstances

Mr. Brindley argues that the only way to establish undue influence is with proof of a confidential relationship in addition to at least one other suspicious circumstance. He further asserts that there is no proof in the record of a confidential relationship between him and his father.

Our courts have stated that the existence of a confidential relationship is one of the "suspicious circumstances" most frequently relied upon to show undue influence. *Fell*, 36 S.W.3d at 847-48; *see In re Estate of Elam*, 738 S.W.2d at 173; *Kelly*, 558 S.W.2d at 848; *Mitchell*, 779 S.W.2d at 388; *Taliaferro*, 622 S.W.2d at 835-36.

A confidential relationship is not merely one of mutual trust and confidence, but one where confidence is placed by one person in another and the recipient of that confidence is the dominant personality, with ability, because of that confidence, to influence and exercise dominion and control over the weaker or dominated party. *Mitchell*, 779 S.W.2d at 389; *Iacometti v. Frassinelli*, 494 S.W.2d 496, 499 (Tenn. Ct. App. 1973). Confidential relationships may take a variety of forms, and the courts have not attempted to precisely define all relationships which may qualify. *Robinson v. Robinson*, 517 S.W.2d 202, 206 (Tenn. Ct. App. 1974).

> A confidential relationship may be found in a variety of circumstances: "'Although our courts have not defined very clearly the elements which must be present for a confidential relationship to exist, it appears that any relation of confidence between persons which gives one domination over the other falls within the category.'"

*Brown v. Weik*, 725 S.W.2d 938, 945 (Tenn. Ct. App. 1983) (quoting *Robinson*, 517 S.W.2d at 206).

Although courts have been hesitant to limit the types of relationships which might be found to be confidential, Tennessee courts have recognized two types of confidential relationships which differ in their creation and in their effect on the burden of proof as to undue influence. A "legal confidential relationship" is one upon which the law imposes fiduciary responsibilities or "prohibits gifts or dealing between the parties." *Matlock*, 902 S.W.2d at 385-86 (quoting *Kelly*, 558 S.W.2d at 848). These fiduciary relationships are confidential *per se* because of the legal relationship of the parties. Examples include attorney and client, guardian and ward, and conservator and ward. Proof of the existence of a "legal confidential relationship," coupled with a transaction beneficial to the dominant party, automatically gives rise to the presumption of invalidity of the transaction. *Matlock*, 902 S.W.2d at 385.

An unrestricted power of attorney creates a confidential relationship between the parties. *Matlock*, 902 S.W.2d at 386 (citing *Mitchell*, 779 S.W.2d at 384). This court has held that proof that a power of attorney was executed after the will and was not utilized for a number of years after execution of the will was sufficient for the jury to conclude no *per se* confidential relationship existed and no undue influence was exercised. *Crain v. Brown*, 823 S.W.2d 187, 194 (Tenn. Ct. App. 1991), *overruled on other grounds by Matlock*, 902 S.W.2d at 386. Similarly, the Tennessee Supreme Court has recently clarified *Matlock* by holding that an unexercised power of attorney does not in and of itself create a confidential relationship. *Childress v. Currie*, 74 S.W.3d 324, 329 (Tenn. 2002).

Linda Dale argues that Robert Brindley had a confidential relationship with their father once the testator executed the power of attorney to his son in September of 1989. On the other side, Robert Brindley argues that the power of attorney making him his father's attorney in fact had been revoked as a matter of law by the appointment of a guardian ad litem at the beginning of the conservatorship proceedings. He asserts the guardian ad litem provided the testator with a weekly allowance and handled the testator's financial affairs. Therefore, Mr. Brindley asserts, he had no control over the testator's financial affairs at the time the codicil was signed.

The record reflects that Robert Brindley attempted to exercise the power of attorney at least twice: (1) in requesting an audit or records of the lumber yard business; and (2) in answering the petition for appointment of a conservator. We do not agree that the appointment of the guardian ad litem to represent the testator's interest in the conservatorship proceeding revoked the power of attorney as a matter of law. Tenn. Code Ann. § 34-1-107 sets out the duties of a guardian ad litem and does not include the duty or authority to assume control of the assets or estate of the person on whose behalf a conservatorship proceeding is brought. *See also* Tenn. Code Ann. § 34-6-104 (stating that a fiduciary including a conservator, charged by the court with the management of the principal's property may revoke or amend a pre-existing power of attorney).

However, the evidence indicates that the guardian ad litem, as a matter of fact, undertook handling of the testator's financial affairs, at least for a while and to some extent. The guardian ad litem testified that he kept the checkbook, paid some bills, and gave the testator money weekly for living expenses. He later turned these duties over to the testator's grandchildren because it was more economical for the testator. We note that the record also indicates that upon the filing of the petition, the court issued a restraining order that may have prohibited Robert Brindley from using the power of attorney. There is no evidence that Robert Brindley attempted to use the power of attorney after the filing of the motion to dismiss. In this situation, it may be true that as of April 1990, the power of attorney did not create a confidential relationship *per se* because the legal status of the parties did not, at that time, create a fiduciary duty upon Robert Brindley in his actions toward the testator. Nonetheless, the power of attorney is relevant to the degree of control or influence Robert Brindley may have had over his father during this time period as well as the degree of confidence reposed in his son by the testator.

That is because confidential relationships are not limited to those which are officially sanctioned by law and impose responsibilities because of the legal status of the parties. The term also includes less well-defined relationships where one party reposes confidence in another, and acts in reliance upon the other's representations. Where, however, the relationship arises from "family or other relationships," proof of the additional elements of dominion and control is necessary to give rise to the presumption of undue influence. *Matlock*, 902 S.W.2d at 385-86 (citing *Kelly*, 558 S.W.2d at 845); *see also Mitchell*, 779 S.W.2d at 384. The mere relationship of a parent and child, without more, is not sufficient to prove a confidential relationship. *Harper v. Watkins*, 670 S.W.2d 611, 628 (Tenn. Ct. App. 1983) (citing *Kelly*, 558 S.W.2d at 847). In *Kelly*, the Tennessee Supreme Court specifically held:

> [T]he normal relationship between a mentally competent parent and an adult child is not per se a confidential relationship and raises no presumption of the invalidity of a gift from one to the other.

*Kelly*, 558 S.W.2d at 848. Thus, close familial relationships, unlike legal relationships, are not confidential *per se*. Whether a particular relationship constitutes a confidential relationship so as to create a presumption of invalidity of a transaction beneficial to the grantee must be answered by the evidence in a particular case.

> In order for such a presumption to arise there must be a showing that there were present the elements of dominion and control by the stronger over the weaker, **or** there must be a showing of senility or physical or mental deterioration of the donor **or** that fraud and duress was involved, **or** other conditions which would tend to establish that the free agency of the donor was destroyed and the will of the donee was substituted therefor.

*In re Estate of Elam*, 738 S.W.2d at 173 (quoting *Kelly*, 558 S.W.2d at 848) (emphasis added). There must also be a showing of some activity on the part of the beneficiary in connection with the preparation or execution of the will. *Kelly*, 558 S.W.2d at 847; *Halle*, 199 Tenn. at 445, 287 S.W.2d at 61.

Despite Mr. Brindley's arguments that no evidence was presented to establish the required elements of dominion and control, we find that there was material evidence from which the jury could have concluded that the testator had suffered mental deterioration, that the testator had come to depend on Robert Brindley, that the testator was easily manipulated, and that Robert Brindley was involved in the change in the codicil which gave him 50% of the lumber business, in contrast to all previous wills and codicils.

> Where, however, the contestant shows the existence of suspicious circumstances such as a confidential relationship in combination with the beneficiary's involvement in procuring the will, or in combination with impairment of the testator's mental capacity, there arises the presumption of fraud or undue influence.

-19-

*Taliaferro*, 622 S.W.2d at 835-36. The existence of a confidential relationship, followed by a transaction where the dominant party receives a benefit from the other party, gives rise to a presumption of undue influence. *Matlock*, 902 S.W.2d at 386.

Even without evidence of a confidential relationship between the testator and the beneficiary, evidence of other suspicious circumstances create a jury question on undue influence. *Hamilton v. Morris*, 67 S.W.3d 786 (Tenn. Ct. App. 2001) (citing *Mitchell*, 779 S.W.2d at 389-90). As stated earlier, whether the circumstances relied upon by the person challenging the document are sufficient to invalidate it should be "decided by the application of sound principles and good sense to the facts of each case." *Halle*, 199 Tenn. at 454, 287 S.W.2d at 61.

In this very fact-specific inquiry, taking the strongest legitimate view of the evidence in the light most favorable to the verdict, we find there was material evidence from which the jury could have found that the testator was unduly influenced. The testator was of the advanced age of eighty-one (81) when the final codicil was created. Without question, his mental faculties had deteriorated. Later testimony indicated he was suffering from dementia. Both Linda Dale and her daughter testified regarding the deterioration in his mental acuity after his 1988 hospitalization. Six months prior to execution of the codicil at issue, a petition for conservatorship had been filed supported by medical opinions that the testator was incompetent to manage his affairs. Dr. Auble testified that the testator was particularly vulnerable to manipulation due to his lack of day-to-day memory. Dr. Auble examined the testator only days before the execution of the final codicil.

In addition, there was testimony establishing Robert Brindley's role in the revision of the codicil at issue. The jury could have decided and found significant that when the attorney read the document to the testator he voiced no objection, that immediately upon leaving the attorney's office Mr. Baker took the testator to Robert Brindley's office, that when Robert Brindley read the document to the testator he found it unacceptable, that Mr. Baker immediately returned the testator to the lawyer's office, that the testator appeared agitated and confused later in the day, and that Robert Brindley disclaimed any recollection of that incident.

The jury could have found suspicious circumstances or indications that the codicil was not the product of the testator's free will from a number of other facts including the relationship between Mr. Brindley and Mr. Baker. Mr. Brindley hired Mr. Baker to care for his father and later hired him at his construction company, although there was some discrepancy between Mr. Brindley's and Mr. Baker's understanding of his job; Mr. Baker drove the testator to the lawyer's office to have the final codicil drafted and then took the testator to Mr. Brindley's office, and back again to the lawyer's office. Mr. Baker's testimony regarding the testator's condition differed from that of other people who saw the testator daily.

The jury could also have found suspicious, or indicative of the influence of Robert Brindley over his father, Mr. Brindley's sudden increased involvement in his father's life, including the payment of over $40,000 in attorney fees in an effort to keep the testator from being declared incompetent. His contact with his father increased after the testator was placed in the nursing home.

-20-

After the testator returned home and became more mobile, the testator frequently wanted to visit his son to discuss specific matters. The testator executed a power of attorney making his son his attorney in fact, which the son attempted to use to gain access to records of the lumber business. Linda Dale always took care of her parents and their business and only after the onset of the testator's mental deterioration did Mr. Brindley begin visiting more often and taking an interest in the testator's health care. While Mr. Brindley asserts that his father was angry with Linda Dale because she did not want him to leave the nursing home and, allegedly, because of his dissatisfaction of some transactions in the lumber business, the jury could have reached a different conclusion regarding the incentive for the testator's change of mind.

Other facts which the jury could have found and relied upon include: secrecy concerning the will's existence, even though Robert Brindley had been consulted by his father about the codicil, and the testator's inability to read due to medical problems. In addition, the April 1990 codicil attempted a change from prior testamentary dispositions in a way that benefitted Robert Brindley. Under it, he would receive half of the lumber business; under previous wills and codicils, he would have received no interest in that business.[7]

Mr. Brindley relies on *In re Estate of Elam,* 738 S.W.2d 169 (Tenn. 1987), wherein the Tennessee Supreme Court affirmed the jury's finding of insufficient evidence that undue influence was exercised, and observed:

> It is the long established rule in this State that in reviewing a judgment based upon a jury verdict the appellate courts are not at liberty to weigh the evidence to decide where the preponderance lies, but are limited to determining whether there is material evidence to support the verdict; the appellate court is required to take the strongest legitimate view of all of the evidence in favor of the verdict, to assume the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict, and to discard all to the contrary. Having thus examined the record, if there be any material evidence to support the verdict, it must be affirmed . . . . *Electric Power Board v. St. Joseph Valley Struct.*, 691 S.W.2d 522, 526 (Tenn. 1985).

*In re Estate of Elam*, 738 S.W.2d at 171. This rule applies equally in the case before us. Herein, however, the jury specifically found that, while the testator possessed testamentary capacity, the execution of the final codicil was not the testator's own free act and will, but was the result of the undue influence of Robert Brindley, Sr.

The record before us contains material evidence to support the jury's finding of undue influence and, consequently, sufficient evidence to support denial of a directed verdict. Obviously, there were disputed material facts, and from the evidence presented more than one conclusion could

---

[7]The 1990 codicil purported to revoke all other wills and codicils including an earlier bequest of real property to an employee of testator. Nothing in the record explains this change of intention by the testator.

have been drawn as to the issues presented. "The rule is well settled that where the evidence is in conflict, as here, and there is material evidence both ways on fact questions, this Court will not disturb the jury's verdict." *East Tennessee & W.N.C.R. Co. v. Gouge*, 30 Tenn. App. 40, 42, 203 S.W.2d 170, 171 (1947). Because the record contains sufficient evidence which would allow the jury to find undue influence, the trial court correctly denied Mr. Brindley's request for a directed verdict.

### B. Rebutting the Presumption

Mr. Brindley argues that even if there is sufficient evidence for the presumption of undue influence to arise, the presumption was rebutted by clear and convincing evidence of the fairness of the transaction. He correctly states the generally applicable rule that once the challengers present sufficient evidence to substantiate their undue influence claim, the proponents of the document must present clear and convincing evidence that the challenged transaction or testamentary disposition was fair. *Hamilton*, 67 S.W.3d at 793; *see also Matlock*, 902 S.W.2d at 386; *Richmond v. Christian*, 555 S.W.2d 105, 107 (Tenn. 1977).

The "fairness of the transaction" standard is readily applicable and unquestionably reasonable in the situation where the question is whether the dominant party has taken undue advantage of the weaker party. In that case, the objective fairness to the weaker party is relevant and reasonably obtainable. *See, e.g.*, *Richmond*, 555 S.W.2d at 105 (holding unfair a transaction where an elderly woman transferred her only asset to her son and, thereby, impoverished herself).

In the case before us, however, the testator did not suffer any disadvantage. The fairness of the testator's distribution of his estate between his two children is not readily measurable by any objective standards. A parent's view of fairness may be shaped by many factors which cannot be known by outsiders. However, because the parties have each argued the fairness, or lack thereof, of the distribution made in the codicil, and because fairness is a question of fact, we examine the jury's implicit finding that the presumption of undue influence was not overcome.[8]

Considering the evidence in the record, a jury could find that the changes to the will unduly benefitted Robert Brindley in light of the unremitting care Linda Dale provided to her parents, as compared to Mr. Brindley's involvement with them, the Dales' lengthy involvement in running the lumber yard, Mr. Brindley's lack of involvement in the operation of the lumber yard, the testator's promise that the Dales would own the lumber yard if they continued to pay him, and Mr. Brindley's full ownership of a construction business he acquired from the testator, even though Mr. Brindley testified he had purchased the assets of that business from his father, and they were few at the time of purchase.

---

[8]The jury was instructed that the presumption of undue influence could be overcome by clear and convincing evidence that the codicil was "not the result of undue influence." In addition, the jury was told that in making a determination as to undue influence, it could consider whether the terms of the codicil unduly benefitted the beneficiaries.

While Mr. Brindley argues that a completely equal distribution is fair, we note the codicil does not make an equal distribution because the testator only owned 51% of the lumber yard, and the codicil gave 98% of that interest to Robert Brindley. Mr. Brindley argues that the distribution makes an equal distribution by taking into consideration the earlier transfer to Linda Dale and her husband of part of the lumber yard business and earlier purchases by Mr. Brindley of the gas station, the farm, and the construction businesses. To the extent the jury's verdict includes a finding that the codicil would unduly benefit Robert Brindley, or can be construed as including a finding that the codicil did not make a fair distribution, we find there was material evidence in the record to support the finding that the presumption of undue influence was not overcome.

Because the effect of undue influence creates a disposition contrary to the independent will of the testator or grantor, *Crain*, 823 S.W.2d at 194, courts will look at whether the disposition is unjust or unnatural or whether it differs from the testator's expressed intentions. *Mitchell*, 779 S.W.2d at 388. For example, in *Richmond* an elderly woman, who lived with one of her children, in essence revoked an earlier stated intent to divide of her estate equally among her three children by giving by deed the only asset she owned to the one child. The court found a presumption of undue influence had arisen on the basis of several circumstances, including the donor's sudden change of plan from making an equal division of her real estate among her three children to making a wholesale transfer to her son. *Id*. at 108.

The jury herein could have concluded that the codicil was contrary to the testator's previously expressed intentions to leave his remaining 51% in the lumber yard to his daughter and her husband who had worked in the business for many years. At trial, Linda Dale testified:

> He [the testator] said that Terry and I would [own the lumber yard]. He said that as long as we would take care of him and Mother and work, even though they might not be able to work, that they could draw their money like they always did, and we took care of the business like we did when they were able to help us.

Other witnesses confirmed this stated intent of the testator. Although there was some testimony that the testator made statements closer in time to the execution of the codicil that he wanted to leave his estate equally to his children, the jury could have found these statements inconclusive, not credible, or themselves the product of undue influence.

Mr. Brindley further argues that the fact that the testator received independent legal advice rebutted the presumption of undue influence raised by Linda Dale. Proof that the testator had independent legal advice concerning the transaction is one way of showing fairness. *Hamilton*, 67 S.W.3d at 793; *Mitchell*, 779 S.W.2d at 389. However, it is proof that the donor received independent and complete advice "respecting the consequences and advisability of the gift" that constitutes an example of fairness. *Richmond*, 555 S.W.2d at 107-08.

> Moreover, the decedent apparently did not seek and, certainly, did not receive advice from an independent source concerning the advisability of the transfer to her son.

Attorney Price admitted this in his testimony; his discussion of the transaction with Mrs. Christian was cursory at best. He merely determined that she knew that the deed transferred the entire tract to her son and that such a transfer was what she intended. This falls short of the rule stated in *Turner v. Leathers*, supra, that the independent advice be complete as well as private. In that case, the donor met with an alleged independent advisor and told him that he knew what he was doing and intended to do it; but, the court observed:

> It is not a question of whether he knew what he intended to do, but *how this intention was produced, whether it was by abuse of a confidential and fiduciary relation.*

*Richmond*, 555 S.W.2d at 109 (quoting *Turner v. Leathers*, 191 Tenn. 292, 297, 232 S.W.2d 269, 271 (1950)).

The testimony of Mr. Forrester, the attorney who prepared the codicil at issue,[9] does not come close to establishing that he explored the change in his first draft or the advisability of it. He did not even testify that he was asked to make a change after his first draft. His only recollection of the execution of the codicil was that he was certain it followed the procedure he normally used. He also testified that the testator understood what the codicil did. This testimony goes to establishing proper execution and testamentary capacity. Undue influence presupposes a mind of testamentary capacity. *Parham v. Walker*, 568 S.W.2d 622, 624 (Tenn. Ct. App. 1978). There is no evidence in the record that the testator sought or received independent or complete advice regarding the advisability of the change in his codicil and no evidence that any independent advisor sought to determine the how his "intention was produced."

On the basis of the evidence in the record, we conclude that Mr. Brindley did not, as a matter of law, overcome the presumption of undue influence and, therefore, the court properly allowed the issues to go to the jury. The trial court correctly denied a directed verdict.

IV.  Thirteenth Juror

Next, Mr. Brindley argues a new trial should be granted on the issue of undue influence because the jury's verdict was against the weight of the evidence. He maintains that the trial court was required to grant a new trial in that situation in performance of its duty as a thirteenth juror.

One of the functions a trial judge possesses and should exercise is that of a thirteenth juror. *Holden v. Rannick*, 682 S.W.2d 903, 904-05 (Tenn. 1984) (quoting *Cumberland Telephone & Telegraph Co. v. Smithwick*, 112 Tenn. 463, 469, 79 S.W. 803, 804 (1904)). In this capacity, the trial judge is under a duty to independently weigh the evidence and determine whether the evidence preponderates in favor of or against the verdict. *Woods v. Walldorf & Co., Inc.*, 26 S.W.3d 868, 873

---

[9]The record indicates that the prior two codicils were not drafted by Mr. Forrester, who wrote the original will.

(Tenn. Ct. App. 1999) (quoting *Shivers v. Ramsey*, 937 S.W.2d 945, 947 (Tenn. Ct. App. 1996)); *Witter v. Nesbit*, 878 S.W.2d 116, 121 (Tenn. Ct. App. 1993); *Grissom v. Metropolitan Gov't of Nashville and Davidson Co.*, 817 S.W.2d 679, 684 (Tenn. Ct. App. 1991). The trial judge, after making an independent decision on the issues, must be satisfied with the verdict, and, if dissatisfied, must set it aside. *Holden*, 682 S.W.2d at 905.

Where a trial judge approves the verdict without comment, an appellate court will presume that the judge has adequately performed her function as a thirteenth juror. *Holden*, 682 S.W.2d at 905 (citing *Central Truckaway Sys. v. Waltner*, 36 Tenn. App. 202, 217, 253 S.W.2d 985, 991 (1952)). The trial court, like the jury, is not bound to give reasons for its action in granting or denying a new trial based on the preponderance of the evidence. *James E. Strates Shows, Inc. v. Jakobik*, 554 S.W.2d 613, 615 (Tenn. 1977). Where the reasons given by the trial court, or statements made, in ruling on the motion for new trial indicate the trial court was actually dissatisfied with the verdict or misapprehended its function as the thirteenth juror, appellate courts are required to grant a new trial. *Holden*, 682 S.W.2d at 905; *Jakobik*, 554 S.W.2d at 615.

> The discretion permitted a trial judge in granting or denying a new trial is so wide that our courts have held that he does not have to give a reason for his ruling. If he does give reasons, the appellate court will only look to them for the purpose of determining whether he passed upon the issue and was satisfied or dissatisfied with the verdict. *Wakefield v. Baxter*, 41 Tenn. App. 592, 297 S.W.2d 97; *State v. Kenner*, *supra*. If the trial judge does not give a reason for his action, the appellate courts will presume he did weigh the evidence and exercised his function as thirteenth juror. *Gordon's Transports v. Bailey*, 41 Tenn. App. 365, 294 S.W.2d 313; *Benson v. Fowler*, 43 Tenn. App. 147, 306 S.W.2d 49.

*Mize v. Skeen*, 63 Tenn. App. 37, 43, 468 S.W.2d 733, 736 (Tenn. Ct. App. 1971).

The record before us contains no indication that the trial judge did not properly perform the function of thirteenth juror, independently assess the evidence and the issues, and approve the verdict. Mr. Brindley points to no such indication, but relies only on his argument that the evidence preponderates against the verdict. We cannot infer from any of the court's comments that it did not weigh the evidence or that it disagreed with where the preponderance lay. *See Shivers*, 937 S.W.2d at 947. Because we must presume, and in fact we find, that the trial court properly performed its function as thirteenth juror, our review of Mr. Brindley's argument regarding the sufficiency of the evidence is subject to the well-established standard discussed earlier. *Woods*, 26 S.W.3d at 874. Our role is simply to examine the record to determine if there is any material evidence to support the verdict. Tenn. R. App. P. 13(d). We have already determined that there is material evidence to support the verdict.

V. Jury Instructions

Mr. Brindley also argues that a new trial is required because the jury was improperly instructed. He maintains that the charge was incomplete because it failed to provide sufficient information on the law of undue influence by distinguishing between direct and circumstantial evidence, the burden of proof, and confidential relationships in combination with other suspicious circumstances. Mr. Brindley claims that the jury should have been instructed that proof of threats and coercion regarding the provisions of the will are necessary to prove undue influence by direct evidence, that proof of his specific intent to unduly influence the testator was required, and that proof the transaction was fair, including proof of independent advice, would rebut the presumption of undue influence.

The jury was instructed on the issue of undue influence as follows:

A will or codicil thereto may not be enforced if it is brought about by undue influence. Undue influence is the overcoming of the mind of the person making a will or a codicil by acts or conduct of another person.

Mere general influence of another person that does not affect the act of making a will or a codicil is not undue influence. To be undue influence, the influence must amount to coercion that destroys the freedom of choice of the person making the will or codicil thereto. It substitutes the wishes or desires of another person and compels the maker of the will or codicil to dispose of property in a way that would not have been done otherwise.

This language, with the exception of the term "codicil," is taken verbatim from TENNESSEE PATTERN JURY INSTRUCTIONS CIVIL § 11.37 (3d ed. 1997).

Omitting only a portion of § 11.38, dealing with individuals who have "no blood relationship to the maker of the will," which was irrelevant to the case before us, the court then quoted the remaining pattern jury instruction as follows:

In determining the issues of undue influence, you may consider, among other things, the following:

1. Did the terms of the will or codicil unduly benefit the beneficiaries[10] of the will or codicil?
2. Are the terms of the will or codicil different from the expressed intentions of the maker of the will or codicil?
3. Did the beneficiaries' relationship to the person making the will or codicil give the beneficiaries an opportunity to influence the terms of the will or the codicil thereto?

_____

[10]The pattern instruction uses the term "chief beneficiary."

-26-

4. Did the mental and physical condition of the maker of the will or codicil allow the maker's freedom of choice to be overcome by the actions of others?
5. Did the beneficiaries of the will or codicil actively take part in determining the provisions of the will or codicil, or in causing it to be executed?

The court also instructed the jury on the issue of confidential relationships and presumptions as follows, tracking the language of § 11.39 of the pattern jury instructions:

A confidential relationship exists whenever the trust and confidence of one person is placed in the honesty and faithfulness of another.

There is a presumption that the will or codicil thereto was obtained by the undue influence of Robert W. Brindley, Sr. if you find:

1. That a confidential relationship existed between the person making the will and codicil thereto and Robert W. Brindley, Sr.; and
2. That Robert W. Brindley, Sr., was active in causing the will or codicil thereto to be made, and unduly profited from it.

This presumption may be overcome if Robert W. Brindley, Sr. proves by clear and convincing evidence that the making of the will and codicil thereto or codicil thereto was not the result of undue influence.

In addition, the trial court gave the pattern instruction on direct and circumstantial evidence.

In Mr. Brindley's request for jury instruction, he submitted a list of issues and asked the court to instruct the jury on them using the "Civil Tennessee Pattern Jury Instructions (Third Edition), each in its entirety unless stated otherwise." Included on that list were direct and circumstantial evidence; will contest -- nature of the proceedings; and burden of proof. In addition, Mr. Brindley requested only one special instruction, which dealt with capacity to make a testamentary gift, as contrasted with capacity to transact business generally.

Significantly, the record contains no request from Mr. Brindley to give additional or more specific instructions on the law of undue influence, confidential relations, or suspicious circumstances. At the conclusion of the trial, the court made sure that the parties had copies of the revised jury charge and considered the parties' corrections. Then the trial court asked counsel if there was "anything else on the charge we need to discuss." Mr. Brindley's counsel answered in the negative. After the jury was instructed, the court heard objections to the charge. Mr. Brindley did not object to the trial court's charge on the law of undue influence, confidential relations, or suspicious circumstances.

Tenn. R. Civ. P. 51.02 provides:

After the judge has instructed the jury, the parties shall be given opportunity to object, out of hearing of the jury, to the content of an instruction given or to failure to give a requested instruction, but failure to make objection shall not prejudice the right of a party to assign the basis of the objection as error in support of a motion for a new trial.

Rule 51.02 permits parties to allege error in their motions for a new trial based upon either inaccuracy of the charge as given or failure to give a requested appropriate instruction, even though no objection or exception in this respect was made at the trial. *Rule v. Empire Gas Corp.*, 563 S.W.2d 551, 554 (Tenn. 1979). Prior to the adoption of Rule 51.02 a party was precluded from predicating error upon an alleged omission in the instructions of a trial judge unless the party had pointed out such omission to the trial judge prior to the submission of the case to the jury. *Id.* "Rule 51.02 does not constitute a departure from previous procedure in this state . . . as the advisory committee comment to the rule indicates . . . ." *Id.* Rather, Rule 51.02 allows parties in certain circumstances, not present herein, to object to jury instructions on appeal when an instruction was inappropriately given or a party requested an instruction and it was not given despite the objecting parties' silence to the objection before the lower court.

Nothing in Rule 51.02 relieves a party of the duty to request an instruction. The procedural rule governing this matter prior to Rule 51.02, namely that "if the court's charge were merely incomplete, the duty was upon the aggrieved party to call the incompleteness to the attention of the court, or the defect is waived," *Homes v. American Bakeries Co.*, 62 Tenn. App. 601, 466 S.W.2d 502, 505 (1976); *see also Provence v. Williams*, 62 Tenn. App. 371, 462 S.W.2d 885, 887 (1970), has not been changed by the enactment of Rule 51.02. The Tennessee Supreme Court has held since Rule 51.02, that:

> Rule 51.02 of the Tennessee Rules of Court Procedure has not abolished or altered the rule announced in the *Provence* and *Holmes* cases . . . that in order to predicate error upon an alleged omission in the instructions given to the jury by the trial judge he must have pointed out such omission to the trial judge by an appropriate request for instruction.

*Rule*, 563 S.W.2d at 554. Therefore "nothing in the rule . . . relieves trial counsel of the burden of requesting an instruction to cover alleged omissions in the instructions as given." *Id.* In other words, parties bear the responsibility of bringing to the trial court's attention material omissions in the instructions. *Id.*; *Henry County Bd. of Educ. v. Burton*, 538 S.W.2d 394, 397-98 (Tenn. 1976); *Jones v. Tennessee Farmers Mut. Ins. Co.*, 896 S.W.2d 553, 556 (Tenn. Ct. App. 1994). Where they fail to do so, this court will not reverse unless convinced that the party complaining has been prejudiced by such instruction, or that justice is about to miscarry. *Burton*, 538 S.W.2d at 397 (quoting *Carney v. Cook*, 158 Tenn. 333, 340, 13 S.W.2d 322, 325 (1929)).

Although Mr. Brindley characterizes the instructions as "erroneous," his actual complaint is that additional or more specific instructions should have been given. However, he did not ask for

any additional instruction on these issues. Under the circumstances, we find that Mr. Brindley waived this issue by failing to bring to the court's attention what he now argues were material omissions in the charge. Having considered the charge, we cannot say that Mr. Brindley was prejudiced by the instructions given, or that justice is about to miscarry. *Burton*, 538 S.W.2d at 397.

## VI.

Accordingly, we affirm the judgment of the trial court. This case is remanded for any further proceedings which may be necessary. Costs of this appeal are taxed to Robert W. Brindley, Sr., for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE